**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

GARNISH AND GATHER, LLC,

   *Plaintiff*,

 -against-

TARGET CORPORATION AND TARGET
BRANDS, INC.,

   *Defendants*.

Case No. 1:19-cv-10404-JSR

**ORAL ARGUMENT REQUESTED**

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR**
**PRELIMINARY INJUNCTION**

Joseph M. Pastore III (JP1717)
Pastore & Dailey LLC
420 Lexington Avenue, 3rd Floor
New York, NY 10170
845.667.5711 (p)
646.661.4322 (f)
*Attorneys for Plaintiff*


Michael Lee
Lee Law PLLC
579 Fifth Avenue, 14th Floor
New York, NY 10606
212-621-8239
*Advisory Attorney*

# **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ...................................................................................................1

STATEMENT OF FACTS ........................................................................................................2

A.          G&G's Trademarks and Business.......................................................................2

B.          Defendants' Infringing Uses of the G&G Marks ...................................................3

C.          G&G has Suffered and Will Continue to Suffer Irreparable Harm ...........................6

D.          Communications with Defendants..........................................................................8

ARGUMENT ........................................................................................................................8

A.          Legal Standard....................................................................................................8

B.          G&G is Likely to Prevail on the Merits..................................................................9

C.          G&G Will Suffer Irreparable Harm Absent a Preliminary Injunction ...............18

D.          At a Minimum, G&G has Shown Sufficiently Serious Questions Going to the Merits, and the Balance of Hardships Tips Decidedly in G&G's Favor............20

E.          The Public Interest Weighs in Favor of an Injunction.........................................21

CONCLUSION....................................................................................................................22

# TABLE OF AUTHORITIES

## Cases

*Abercrombie & Fitch Company v. Hunting World, Incorporated*, 537 F.2d 4 (2d Cir. 1976) ........................................................................................................................ 10

*Am. Electromedics Corp. v. Welch Allyn, Inc.,* No. 87-CV-1373, 1988  WL 12776 (N.D.N.Y. Feb. 16, 1988).......................................................................................... 20

*Barefoot Contessa Pantry, LLC v. Aqua Star* (USA) Co., No. 15-CV-1092 (JMF), 2015 U.S. Dist. LEXIS 24013 (S.D.N.Y. Feb. 26, 2015).......................................................... 9

*Bulman v. 2BKCO, Inc.,* 882 F. Supp. 2d 551 (S.D.N.Y. 2012)...................................... 18, 21

*C.L.A.S.S. Promotions, Inc. v. D.S. Magazines, Inc.*, 753 F.2d 14 (2d Cir. 1985)................ 14

*Cadbury Beverages v. Cott Corp.*, 73 F.3d 474 (2d Cir. 1996) .............................................. 13

*De Beers LV Trademark Ltd. v. DeBeers Diamond Syndicate, Inc.*, 440 F. Supp. 2d 249 (S.D.N.Y. 2006) ................................................................................................... 15

*eBay Inc. v. MercExchange*, LLC, 547 U.S. 388 (2006).......................................................... 9

*Gayle Martz v. Sherpa Pet Group, LLC*, 651 F. Supp. 2d 72 (S.D.N.Y. 2009) .................... 22

*Giggle, Inc. v. netFocal, Inc.*, 856 F. Supp. 2d 625 (S.D.N.Y. 2012) .................................... 10

*Gruner + Jahr USA Publ'g v. Meredith Corp.*, 991 F.2d 1072 (2d Cir. 1993) ...................... 11

*Hasbro, Inc. v. Lanard Toys, Ltd.,* 858 F.2d 70 (2d Cir. 1988) .............................................. 18

*Hormel Foods Corp. v. Jim Henson Prods.*, 73 F.3d 497 (2d Cir. 1996) .............................. 17

*Juicy Couture, Inc. v. Bella Int'l Ltd.*, 930 F. Supp. 2d 489 (S.D.N.Y. 2013)................. 11, 13

*Louis Vuitton Malletier v. Burlington Coat Factory Warehouse Corp.*, 426 F.3d 532 (2d Cir. 2005) ................................................................................................................... 9

*Mead Data Cent., Inc. v. Toyota Motor Sales, U.S.A., Inc.*, 875 F.2d 1026 (2d Cir. 1989).. 16

*Mint, Inc. v. Amad,* No. 10 CIV. 9395 SAS, 2011 WL 1792570 (S.D.N.Y. May 9, 2011) .. 21

*N.Y.C. Triathlon, LLC v. NYC Triathlon Club, Inc.*, 704 F. Supp. 2d 305 (S.D.N.Y. 2010) ........................................................................................................................ 14, 22

*Nabisco, Inc. v. PF Brands, Inc.*, 50 F. Supp. 2d 188 (S.D.N.Y. 1999) ................................ 16

*Pfizer Inc. v. Sachs*, 652 F. Supp. 2d 512 (S.D.N.Y. 2009) ...................................................... 16

*Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492 (2d Cir. 1961).................................. 10

*ProFitness Phys. Therapy Ctr. v. Pro- Fit Ortho. and Sports Phys. Therapy P.C.,* 314 F.3d 62 (2d Cir. 2002)............................................................................................................ 21

*Salinger v. Colting*, 607 F.3d 68 (2d Cir. 2010) ....................................................................... 9

*SK & F. Co. v. Premo Pharm. Labs., Inc.*, 625 F.2d 1055 (3d Cir. 1980)............................ 22

*Stix Products, Inc. v. United Merchants & Manufacturers Inc.*, 295 F. Supp. 479 (S.D.N.Y. 1968) .................................................................................................................... 10

*Time, Inc. v. Petersen Pub.  Co. L.L.C.,* 173 F.3d 113 (2d Cir. 1999) ..................................... 9

*Tradescape.com v. Shivaram*, 77 F. Supp. 2d 408 (S.D.N.Y.)............................................... 20

*United States Polo Ass'n v. PRL USA Holdings, Inc.*, 800 F. Supp. 2d 515 (S.D.N.Y. 2011) ........................................................................................................................ 16, 22

*Universal City Studios, Inc. v. Nintendo Co.*, 746 F.2d 112 (2d Cir. 1984) .......................... 12

*Yurman Studio, Inc. v. Castaneda*, 2008 U.S. Dist. LEXIS 99849 (S.D.N.Y. Dec. 1, 2008) 15

**Statutes**

15 U.S.C. § 1114 .................................................................................................................... 21

15 U.S.C. § 1115 ................................................................................................................. 7, 22

15 U.S.C. § 1125 .................................................................................................................... 22

N. Y. C.P.L.R. 302(a)(l)........................................................................................................... 17

Plaintiff Garnish and Gather LLC ("Plaintiff" or "G&G") respectfully submits this memorandum of law in support of its Application for a Preliminary Injunction against Defendants Target Corporation and Target Brands, Inc. (collectively, "Defendants" or "Target").

## PRELIMINARY STATEMENT

G&G has spent many years and substantial resources building public confidence and consumer goodwill in its business and its marks. As a result of these efforts, G&G has become a regional success and is in the process of expanding to new markets. Golub Decl. ¶¶ 12 and 16. When it learned of Target's "Good & Gather" label prior to Target's first public sale, G&G informed Target that it was infringing G&G's trademark rights. Despite notice of infringement and with a willful intent to capitalize on G&G's goodwill, Target launched a product line using the infringing name, immediately interfering with and devaluing G&G's already established goodwill in the marketplace. Golub Decl. ¶ 17. Target's launch appears to be sizable and national.

Target has engaged in willful and blatant copying of G&G's trademarks, business model and logo imagery, and such behavior will cause the public to believe falsely that G&G is the source of Target's food products and/or services, or that such food products and services are endorsed or sponsored by, or otherwise associated or affiliated with G&G. Target is emulating G&G's business model by offering delivery of the food products to consumers directly. Consumers are not required to set foot in one of Target's brick-and-mortar stores to purchase the products, leading to an even higher likelihood of confusion to online purchasing consumers. Pastore Decl. ¶ 11.

Most troubling, Target's use of G&G's trademarks threatens G&G with immediate serious and irreparable harm. Golub Decl. ¶¶ 31-33. Defendants prominently feature

trademarks that are so similar in sound, sight, and cadence that a typical search for a variation of Plaintiff's mark points the seeker in the direction of the Defendant.  By infringing on the marks of a fledging company, Target has essentially stifled G&G's growth potential.  In order to maintain its growth and success, G&G's business delivering organic produce demands entry into new markets, which Target has preempted with its rollout of the infringing trademark nationwide. As a large multinational enterprise with vast resources, Target was in the best position to discover and prevent the infringement on a protected trademark of an already established company that operates in the same marketplace. Yet, Target actively chose to release the new product line despite receiving notice from Plaintiff. For these reasons, Target should be enjoined from causing further harm to Plaintiff's business.

**STATEMENT OF FACTS**

**A.  G&G's Trademarks and Business**

G&G is an Atlanta-based company dedicated to providing locally sourced organic fresh food and vegetables to its customers. Golub Decl. ¶ 4. G&G offers its products and services to its customers via its website: https://garnishandgather.com/. G&G offers more than 200 seasonal artisanal products and ingredients including herbs and spices, fruits and vegetables, proteins, grains, and pastas and is well recognized by its "Garnish and Gather" trademarks, which are often abbreviated as "G&G." Golub Decl. ¶ 4.



G&G is one of the fastest growing and most profitable businesses of its kind. Golub Decl. ¶ 16.  G&G has been steadily growing its business and brand and plans to expand on a

national scale. Golub Decl. ¶ 16.  Since 2016, G&G has exhibited growth of 35% and continues to grow in 2019. Golub Decl. ¶ 14. G&G has achieved yearly revenues in excess of $1 million and, until the recent actions of Defendants, was on track to have its best year yet in 2019. *Id*. Now, due to the blatant infringement by Target on Plaintiff's trademarks, the future of G&G is jeopardized. Golub Decl. ¶¶ 31-33.

G&G owns two trademarks related to the sale and delivery of produce. Golub Decl. ¶ 5. *First*, G&G owns a trademark, US Registration Number 4,598,106, registered with the United States Patent and Trademark Office (the "USPTO"), for the delivery of locally grown organic unprepared foods with instructions in the form of a recipe for preparing the foods under International Class 039, for the transport, packaging and storage of goods and under U.S. Classes 100 and 105 for miscellaneous trademarks and trademarks relating to the transportation and storage of goods, respectively. Golub Decl. ¶ 6, Exh. 1.   *Second*, G&G owns a trademark, US Registration Number 4,598,107, registered with the USPTO, for the sale of locally grown organic fresh fruits and vegetables under international Class 031, for agricultural, horticultural and forestry products and grains not included in other classes and under U.S. Classes 001 and 046 for raw or partly prepared materials and foods and ingredients of foods, respectively. Golub Decl. ¶ 7, Exh. 2.  G&G also has vested common law rights to these trademarks through its continued use of these marks in the United States, most prominently, in the State of Georgia. Golub Decl. ¶ 9. Together, these federally registered trademarks and common law rights constitute the "G&G Marks."

### B.  Defendants' Infringing Uses of the G&G Marks

Target is promoting and marketing their Good & Gather line of products on their website: https://corporate.target.com/article/2019/08/good-gather. Golub Decl. ¶ 24. Target is

further offering the same infringing products for sale online as well. https://www.target.com/b/good-gather/-/N-yfqzk. Golub Decl. ¶ 25. Per Target's website, Target is offering for sale "dairy and produce to ready-made pastas, meats and more…" (https://corporate.target.com/article/2019/08/good-gather). Golub Decl. ¶ 26. Although Target asserts that the parties' goods and services are entirely distinct, Target has already begun to offer goods for sale on their website and in their stores that are identical to the goods offered on G&G's website. Golub Decl. ¶ 19. For example, Target is offering the following stand-alone produce items that G&G has sold to its customers for years: whole white mushrooms, organic lettuce, sweet potatoes, apples, kale, green beans, cheese crackers, peach sparkling water, cucumber sparkling water, grapefruit sparkling water, creamy peanut butter, salted butter, goat cheese, almond butter, eggs, unsalted butter, pears, apples, spinach, asparagus, butternut squash, honey, jam, broccoli, carrots, deli meat, arugula, hummus, guacamole, and meatballs.[1] Golub Decl. ¶ 20. In addition to stand-alone produce items, Target also offers some of the same prepared foods which G&G offers for sale: kale and grain salad bowls, ravioli, cheese tortellini, cooked chicken, prepared soup, cheese pizza, and salad kits. Golub Decl. ¶ 21.

Target is seeking seven trademarks for its infringing "Good & Gather" line of produce identified by Serial Nos. 88180217, 8767101, 87671007, 87670739, 86695606, 86921509, and 86921522. Of those seven, Serial Number 86921509, is sought under the same classes as G&G's trademark, International Class 031 and U.S. Classes 001 and 046. Moreover, despite Target not directly seeking registration in the International Class 039 class for the delivery of produce, Target is offering these similar goods for delivery through its stores. Golub Decl. ¶

---

[1] *See generally* TARGET, https://www.target.com/b/good-gather/-/N-yfqzk?Nao=0 (last visited Oct. 14, 2019) (Pastore Decl. ¶ 3, Exh. 2).

22. As evidenced by Target's website, not only do certain Target stores offer delivery, but the first Target locations to offer such service were in New York City. Golub Decl. ¶ 22. Today, twenty-eight New York City metro area Targets offer delivery services. Golub Decl. ¶ 22. Target also offers its competing delivery service in the Atlanta, Georgia metro areas as well. Golub Decl. ¶ 23.

Target has not only borrowed its new "Good & Gather" brand name from G&G, but it has also borrowed elements of G&G's logos. *First*, G&G regularly promotes its brand with leaf-like imagery, as shown in the images below, which frequently appear on G&G's website. Golub Decl. ¶ 28.

 

Target is promoting its competing "Good & Gather" brand using similar leaf imagery, as shown in the below comparison of the "Good & Gather" logo (left) and the G&G logo (right).

 

*Second*, Target has substantially copied the G&G fork and plate imagery above in a video posted on its website promoting the "Good & Gather" brand. As shown in the image below taken from said video, Target displayed symbols on its lab coats of fork and plate imagery with the plate being the traditional Target logo. Golub Decl. ¶ 27.



While G&G's infringement claims are not based solely on a dispute over logos, the clear copying of the logos and use of the images above demonstrate Target's bad faith in infringing upon the G&G Marks.

Defendants have also declared that their infringing "Good & Gather" line will become their "flagship" food and beverage brand and will include kids, organic, seasonal and premium product lines.[2] On September 15, 2019, Target began selling products featuring the confusingly similar mark at over 1,800 stores nationwide.[3]  Target plans to expand the list of products offered using the mark in question to 2,000 products by the end of 2020.[4] Target has already made substantial progress in making its infringing brand its flagship brand, as evidenced by the overwhelming number of products bearing the infringing mark for sale in Target stores within this District. *See* Affidavit of Raymond P. Dowd (hereinafter "Dowd Aff.") at Exhibit 1.

### C.  G&G has Suffered and Will Continue to Suffer Irreparable Harm

Target's activities with respect to G&G's Marks have resulted in, are resulting in, and

---

[2]  Teresa Rivas, *Target Is Making the Right Moves in Groceries, Analyst Says*, BARRON'S (Sept. 23, 2019, 8:00 AM), https://www.barrons.com/articles/target-stock-groceries-food-retailing-51569017569 (Pastore Decl. ¶ 6, Exh. 5).
[3] Kelly Tyko, *Target launches new Good & Gather food brand Sunday*, USA TODAY (Aug. 19, 2019, 7:00 AM), https://www.usatoday.com/story/money/food/2019/08/19/target-good-gather-new-store-owned-brand-coming-september/1996024001/ (Pastore Decl. ¶ 7, Exh. 6).
[4]  Dave Fusaro, *Target Bets Big on 'Good & Gather' Store Brand*, FOOD PROCESSING (Oct. 1, 2019), https://www.foodprocessing.com/industrynews/2019/target-launches-good-and-gather/ (Pastore Decl. ¶ 5, Exh. 4).

will continue to result in irreparable harm to G&G, including without limitation damage to G&G's reputation and goodwill symbolized by G&G trademarks. Golub Decl. ¶¶ 31-33. Since 2012, G&G has worked tirelessly to develop its brand and reputation for selling locally-sourced organically-grown produce. Golub Decl. ¶ 12. G&G's business plan has been to grow its business and expand to other major cities across the United States. Golub Decl. ¶ 16. Just as G&G began to reach the level of success required for its expansion, Target took advantage of its resources and knowledge of G&G's success and began selling its infringing and competing products around the country. Golub Decl. ¶ 17.

Target's infringing brand immediately threatens the growth and success of G&G. G&G has built its brand and goodwill with its customers by consistently providing only top-tier organic produce. Target is immediately interfering with G&G's reputation and devaluing G&G's business by offering for sale the same types of products with a confusingly similar name at a lesser standard for quality of its goods. The lack of adequate remedy, due in part to the difficulty to prove loss of sales due to infringement, along with the likelihood of confusion resulting in the loss of control over associations with one's marks, illustrate irreparable harm to the goodwill and reputation of Plaintiff.

In the instant matter, the likelihood of confusion with G&G is strong, and the harm likely to occur to its reputation and goodwill is significant, yet not easily quantifiable. The G&G and Target marks are very similar in syntax, cadence, and alliteration. Both start with the letter G, both contain a conjunction between the two respective words, and both contain the word "gather" as the second word. Also, both marks are used to market produce, meal kits, and prepared foods. However, in comparison with G&G's locally sourced, organically grown products, Target sells products of an inferior, mass produced quality. Whereas some

7

of Target's products marketed under the "Good and Gather" banner are organic, their production and distribution is carried out on a massive scale, making it impossible to deliver the same high quality, organic produce goods from boutique growers and producers as G&G offers.   As a result of the confusing similarity between the marks, their use, and the disparity in quality, there is a strong likelihood for confusion that establishes the grave risk of irreparable harm.

### D.  Communications with Defendants

G&G sent a cease-and-desist letter to Target's legal counsel notifying them of their infringement of G&G's trademarks and demanding that they cease and desist the promotion and launch of the "Good & Gather" brand. Pastore Decl. ¶ 9, Exh. 8.  Target responded to this letter incorrectly stating that their use of the mark in the same industry and market is not in any way likely to cause confusion in the marketplace. Golub Decl. ¶ 30. Subsequently, G&G informed Target of its intention to file legal proceedings against Target for trademark infringement if the parties could not reach an amicable resolution. Golub Decl. ¶ 29.  Target launched their infringing product line on September 15, 2019. Golub Decl. ¶ 17.  Subsequently, G&G initiated legal proceedings.

### ARGUMENT

### A.  Legal Standard

A party seeking a preliminary injunction under Fed. R. Civ. P. 65 must demonstrate "(1) the likelihood of irreparable injury in the absence of such an injunction, and (2) either (a) likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation plus a balance of hardships tipping decidedly" in the

movant's favor. *Louis Vuitton Malletier v. Burlington Coat Factory Warehouse Corp.*, 426 F.3d 532, 537 (2d Cir. 2005).

Under the Supreme Court's decision in *eBay Inc. v. MercExchange*, LLC, 547 U.S. 388 (2006), and the Second Circuit's decision in *Salinger v. Colting*, 607 F.3d 68 (2d Cir. 2010), this Court has also concluded that, at least in trademark cases, it should consider whether the balance of hardships tips in Plaintiff's favor, and whether preliminary relief is in the public interest. See *Barefoot Contessa Pantry, LLC v. Aqua Star* (USA) Co., No. 15-CV-1092 (JMF), 2015 U.S. Dist. LEXIS 24013, at *7 (S.D.N.Y. Feb. 26, 2015). Because G&G is likely to succeed on claims for trademark infringement, it would suffer irreparable harm if an injunction does not issue, and because the balance of hardships tips decidedly in favor of an injunction, which is also in the public interest, the Court should grant G&G's motion.

### B. G&G is Likely to Prevail on the Merits

"To prevail on a trademark infringement claim under either 15 U.S.C. § 1114 or 15 U.S.C. § 1125, a plaintiff must demonstrate that it has a valid mark entitled to protection and that the defendant's use of it is likely to cause confusion." *Time, Inc. v. Petersen Pub. Co. L.L.C.,* 173 F.3d 113, 117 (2d Cir. 1999) (internal citations and quotations omitted). G&G can sufficiently demonstrate both elements.

#### i.   *Validity of G&G's Marks*

Each of the federal marks owned by G&G is registered with the USPTO. (Reg. Nos. 4598106 and 4598107). Both of G&G's marks have been in continuous use for at least five years subsequent to their respective dates of registration with the USPTO. Golub Decl. ¶ 10. For each mark, registration is therefore "conclusive evidence of the validity of the registered mark and of the registration of the mark, of [G&G's] ownership of the mark, and of [G&G's]

exclusive right to use the registered mark in commerce." *See* 15 U.S.C. § 1115(b).

> ii.   *Likelihood of Confusion*

When determining likelihood of confusion, courts consider the following nine factors: strength of the plaintiff's mark; similarity of the marks; the competitive proximity of the products; likelihood that the plaintiff will "bridge the gap" between the two markets or product areas; the defendant's intent in adopting the mark; evidence of actual confusion; sophistication of the target consumers; and the quality of the defendant's products or services. *Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492 (2d Cir. 1961). Consideration should be given to the totality of these factors, each helping to inform the court; no single factor is viewed as dispositive. *See generally id.* Through consideration of each factor, it becomes readily apparent that Target's marks are confusingly similar to the G&G Marks, and that confusion between the two is a highly probable outcome of Target's continued use.

> a.   *Strength of the Plaintiff's Mark*

"The strength of a mark depends on two factors: inherent distinctiveness and acquired distinctiveness." *Giggle, Inc. v. netFocal, Inc.*, 856 F. Supp. 2d 625, 631 (S.D.N.Y. 2012). There are four categories for assessing the inherent distinctiveness of marks which go from weakest to strongest: (1) generic, (2) descriptive, (3) suggestive, and (4) arbitrary and fanciful. *Abercrombie & Fitch Company v. Hunting World, Incorporated*, 537 F.2d 4, 9 (2d Cir. 1976).

> A term is suggestive if it requires imagination, thought and perception to reach a conclusion as to the nature of goods. A term is descriptive if it forthwith conveys an immediate idea of the ingredients, qualities or characteristics of the goods.

*Stix Products, Inc. v. United Merchants & Manufacturers Inc.*, 295 F. Supp. 479, 488 (S.D.N.Y. 1968). Here, Plaintiff's trademark is suggestive; it requires us to imagine what went into sourcing the product with which it is associated. The word "gather" suggests the act of

foraging for the produce or foraging amongst produce providers in search of the right product. Accordingly, the mark is inherently strong and therefore warrants greater protection from Target's infringement.

Courts determine the acquired distinctiveness of a mark by considering (1) advertising expenditures; (2) sales success; (3) unsolicited media coverage of the product; (4) attempts to plagiarize the mark; (5) the length and exclusivity of the mark's use; and (6) consumer studies linking the name to the source. *Heartland Trademarks, Ltd. v. DR Flax LLC*, No. 5:17-CV-795 (MAD/ATB), 2017 U.S. Dist. LEXIS 120440, at *8-9 (N.D.N.Y. Aug. 1, 2017) (citing *Juicy Couture, Inc. v. Bella Int'l Ltd.*, 930 F. Supp. 2d 489, 500 (S.D.N.Y. 2013)). Here, G&G has spent approximately $100,000 on paid advertising, $165,000 on advertising through, among other things, events, farmer's markets, loyalty programs and promotional events, and $125,000 on marketing for a total of nearly $400,000 on brand promotion to date. Golub Decl. ¶ 13. G&G has been featured in print and on television both locally on CBS 46, Fox 5 Atlanta, and Better Mornings Atlanta and nationally on HGTV. Golub Decl. ¶¶ 8 and 15, Exh. 3. After opening for business in 2012 and registering its marks in September 2014, G&G exhibited growth of 35% since 2016, achieved revenues of $1.27 million in 2018, and has a projected revenue approaching $2.0 million for 2020. Golub Decl. ¶ 14.

### b. Similarity of the Marks

"When evaluating the similarity of marks, 'courts look to the overall impression created by the [marks] and the context in which they are found and consider the totality of factors that could cause confusion among prospective purchasers.'" *Juicy Couture, Inc. v. Bella Int'l Ltd.*, 930 F. Supp. 2d 489, 500 (S.D.N.Y. 2013) (citing *Gruner + Jahr USA Publ'g v. Meredith Corp.*, 991 F.2d 1072, 1078 (2d Cir. 1993)).

Target's infringing "Good & Gather" mark is similar in sight to the G&G Marks. Both marks consist of three elements—a first word, a conjunction, and a second word—but no one element is more important than the others and the marks should be considered as a whole. *Universal City Studios, Inc. v. Nintendo Co.*, 746 F.2d 112, 117 (2d Cir. 1984) ("[i]n order to determine if confusion is likely, each trademark must be compared in its entirety"). Moreover, a simple Google.com search of "Good and Gather" rather than "Good & Gather" leads the searcher immediately to Target's website, thereby demonstrating the similarity of the conjunctions. Pastore Decl. ¶ 12.



It is more than reasonable to believe that consumers, and especially online consumers, will easily confuse the two marks based on sight alone.

The infringing mark is also similar to the G&G Marks in syntax, cadence, and alliteration. Both start with the letter G, both contain a conjunction, and both contain the word "gather" as their second word.  The conjunction and second word of each mark are identical in sound. Target's use of alliteration also mimics the alliteration of the G&G Marks.  Taking

both marks as a whole, it is also reasonable to expect confusion as to the marks based on sound, and that consumers will incorrectly believe that the brands are associated or otherwise related.

The parties' marks also appear in similar contexts as both are used in the sale, packaging, promotion, and delivery of foodstuffs including produce, pantry items, and meal kits. In addition to this general overlap, the parties also sell many identical goods such as, creamy peanut butter, green beans, sparkling water, cheese tortellini and apples. Because of these similarities between the marks themselves and the context in which they are used, an ordinarily prudent customer could mistakenly conclude that the products originate from the same source. *Juicy Couture, Inc.*, 930 F. Supp. 2d at 501.

### c. The Competitive Proximity of the Products

"In considering this factor, courts examine 'the nature of the products themselves and the structure of the relevant market,' including 'the manner in which the products are advertised, and the channels through which the goods are sold.'" *Id*. (citing *Cadbury Beverages v. Cott Corp.*, 73 F.3d 474, 480 (2d Cir. 1996)). Here, the parties' products are marketed and sold through similar channels. Although G&G does not have any brick and mortar locations, Target and G&G both market, sell, and deliver via the Internet. Therefore, neither customers of G&G nor customers of Target have to set foot in a brick and mortar location to purchase the "Good & Gather" or "Garnish and Gather" products.

Additionally, both Target and G&G market their products to substantially similar consumers. The target audience for both parties is conscious food consumers who consider how and where their food is sourced, with a particular focus on healthy, seasonal, and organic produce. Moreover, both Target and G&G have specific products in their brands which are

particularly branded for children.

For the foregoing reasons, there is substantial overlap between "Good & Gather" and the G&G Marks in both products and customers.

### d.   Likelihood that the Plaintiff Will "Bridge the Gap"

"The term 'bridging the gap' is used to describe the senior user's interest in preserving avenues of expansion and entering into related fields." *N.Y.C. Triathlon, LLC v. NYC Triathlon Club, Inc.*, 704 F. Supp. 2d 305, 338 (S.D.N.Y. 2010) (*citing C.L.A.S.S. Promotions, Inc. v. D.S. Magazines, Inc.*, 753 F.2d 14, 18 (2d Cir. 1985)). "Bridg[ing] the gap" is evidSKenced by the senior user's present intention to expand their sales in an effort to directly compete with the junior user. *Id*. As discussed above, G&G has strived to expand into new markets across the country and has been patient and diligent about its expansion approach. Target presently operates in nearly all U.S. regional markets.[5] Target's use of its confusingly similar mark to sell in these markets and its plan to deliver in these markets will impede G&G's expansion to these markets. As such, there is a strong likelihood that Plaintiff will "bridge the gap" and if its rapid growth is any indication, it will happen very soon.

Conversely, Target may decide to "bridge the gap" by entering the locally sourced food market or they may decide to further develop their meal kit business. As the more established party with substantial capital to invest in new brands, Target is in a better position to offer these services if they so choose. If Target decided to further emulate G&G's business of selling locally sourced goods and offer further meal kit options, they would further infringe on G&G's avenue of expansion. Unless Target ceases their use of the marks in question, G&G's avenue of expansion is entirely in Target's control.

---

[5] *50 States of Target*, TARGET, https://corporate.target.com/about/locations/50-states-of-Target. (last visited Nov. 26, 2019) (Pastore Decl. ¶ 4, Exh. 3).

14

*e. Defendant's Intent in Adopting the Mark*

The "inquiry into willfulness or bad faith 'considers whether defendant adopted its mark with the intention of capitalizing on plaintiff's reputation and goodwill and on any confusion between his and the senior user's product.'" *De Beers LV Trademark Ltd. v. DeBeers Diamond Syndicate, Inc.*, 440 F. Supp. 2d 249, 278 (S.D.N.Y. 2006) (internal citations and quotation marks omitted). Courts attribute willful infringement to a defendant's actions where the defendant "'had knowledge that [its] conduct constituted infringement or where [it] showed a reckless disregard for the owner's rights.'" *Yurman Studio, Inc. v. Castaneda*, 2008 U.S. Dist. LEXIS 99849, at *5 (S.D.N.Y. Dec. 1, 2008).

Here, Target had constructive notice of the G&G Marks prior to its infringement and trademark applications. Pastore Decl. ¶ 13. Upon information and belief, prior to its trademark applications for the seven marks filed for the infringing "Good & Gather" brand, Target conducted or caused to be conducted intellectual property searches that revealed G&G as a potential barrier to its successful use of its marks. Pastore Decl. ¶ 13. Target either made a decision to willfully infringe on the G&G Marks or their failure to conduct a proper intellectual property due diligence search illustrates a reckless disregard for G&G's rights or knowledge that their conduct constituted infringement. In either scenario, Target willfully infringed the G&G Marks.

Moreover, Target had actual notice of the G&G Marks and chose to willfully infringe the G&G Marks. Prior to Target's releasing its infringing brand to the public, G&G sent Target a letter demanding that they cease and desist advertising and promotion of their infringing brand and further informing Target of G&G's intent to litigate. Pastore Decl. ¶ 14, Exh. 8. Instead of halting the release of the infringing products, Target released the brands

with full knowledge of their infringing behavior.

For the foregoing reasons, Target intended to release its new brand with the intention and knowledge of the infringement on the G&G Marks.

### f.  Evidence of Actual Confusion;

"Evidence of actual confusion consists of (1) anecdotal evidence of confused consumers in the marketplace; and (2) consumer survey evidence." *United States Polo Ass'n v. PRL USA Holdings, Inc.*, 800 F. Supp. 2d 515, 520 (S.D.N.Y. 2011). Since actual confusion is very difficult to prove, the Lanham Act requires only a likelihood of confusion. *Id.* at 531. This is particularly true "where, as here, the junior mark has been in the marketplace for a relatively short period of time." *Pfizer Inc. v. Sachs*, 652 F. Supp. 2d 512, 523 (S.D.N.Y. 2009). Target began to sell products using its confusingly similar mark on September 15, 2019. G&G believes that discovery will reveal evidence of actual confusion in the marketplace, which will increase the longer Target is allowed to sell under its infringing brand name. Nevertheless, this claim should prevail in the absence of actual confusion because the likelihood of confusion is extraordinarily high.

### g.  Sophistication of the Target Consumers

The sophistication of the senior mark's customers is inversely related to the likelihood of confusion such that "where the plaintiff's consumers are sophisticated, there is a reduced likelihood that a junior mark will blur the senior mark's selling power." *Mead Data Cent., Inc. v. Toyota Motor Sales, U.S.A., Inc.*, 875 F.2d 1026, 1036 (2d Cir. 1989). In *Nabisco, Inc. v. PF Brands*, this court held that "purchasers of relatively inexpensive goods such as ordinary grocery store foods are held to a lesser standard of purchasing care." *Nabisco, Inc. v. PF Brands,* 50 F. Supp. 2d 188, 206 (S.D.N.Y. 1999). Target's products exhibiting the

confusingly similar mark are sold for between $0.45 and $11.99. Consumers of these relatively inexpensive, ordinary grocery store foods are held to a lesser level of purchasing care which increases the likelihood for confusion. Therefore, because of the inexpensive nature of the goods, the likelihood of consumer confusion is high.

### h.   Quality of the Defendant's Products or Services

The final factor to be considered is the quality of the defendant's products or services, which is relevant in two ways. *Hormel Foods Corp. v. Jim Henson Prods.*, 73 F.3d 497 (2d Cir. 1996). *First*, an inferior product may cause injury to the plaintiff trademark owner because people may think that the senior and junior products came from the same source. *Id. Second*, products of equal quality may tend to create confusion as to source because of this very similarity. *Hormel Foods,* 73 F.3d at 497. Target's products are produced and distributed on a massive, nationwide scale.  While its size allows Target to perform extensive quality control testing, the goods it offers are limited to growers and producers who are large enough to be able to service Target's demand. This makes Target's products of a certain baseline quality; they are frequently organically grown but mass-produced and below the high quality standard of the products G&G offers.  However, the parties' goods are descriptively labeled very similarly—where a less discerning eye would be confused as to source.  G&G's brand is centered around working with small local farmers and chefs to source high-quality produce; any large-scale production or distribution would tarnish the image G&G has worked hard to create.

Based on the foregoing, the relevant factors weigh in favor of finding a likelihood of confusion sufficient for this Court to grant this Motion for Preliminary Injunction.

### C.  G&G Will Suffer Irreparable Harm Absent a Preliminary Injunction

Because G&G has shown there is a likelihood of confusion, it does not need to put forward any additional evidence to show that it will be irreparably harmed absent a preliminary injunction. *See Hasbro, Inc. v. Lanard Toys, Ltd.,* 858 F.2d 70, 73 (2d Cir. 1988) ("In a Lanham Act case a showing of likelihood of confusion establishes both a likelihood of success on the merits and irreparable harm.").

Nevertheless, G&G has shown that it will suffer irreparable harm absent injunctive relief. Plaintiff has invested substantial capital over the last five years in building the value and goodwill associated with the G&G Marks. Golub Decl. ¶ 12. Target has publicly stated that it plans to make the "Good & Gather" line its "flagship" food and beverage brand. Golub Decl. ¶ 18. Taken together, these factors are more than enough to establish irreparable harm. *See, e.g., Bulman v. 2BKCO, Inc.,* 882 F. Supp. 2d 551, 564 (S.D.N.Y. 2012) ("[P]rospective loss of goodwill alone is sufficient to support a finding of irreparable harm.") (internal citations and quotations omitted); *Heartland Trademarks,* 2017 WL 3278905, at *6 ("Plaintiff has invested over twenty years and many millions of dollars in the reputation of [its mark]…In the absence of injunctive relief, Plaintiff faces the loss of control of the reputation of its brand and the prospective loss of goodwill toward the [] mark. Therefore, the Court finds that Plaintiff has met its burden of establishing irreparable harm in the absence of an injunction.").

Here, the threat of irreparable harm is particularly acute. Target is operating in the same market that G&G has operated in for years—the sale of organic and locally-sourced produce. Presently, locally produced and organic produce are both trending areas of business across the country. Golub Decl. ¶ 16. Target's decision to market and sell products using a confusingly similar name as G&G could provide false comfort to consumers who mistakenly

believe that G&G, with its reputation for selling high-quality, locally-sourced organic produce, has sponsored or is associated with Target's products or brand. In the event of discovery of the reality behind this mistaken belief, consumers would associate that deceit with G&G - thus harming the reputation of G&G, impairing the value of the G&G Marks, and causing irreparable injury to G&G.

It is important to note that Defendants have proven that their food product branding is disposable, thereby defeating any argument based on the time and value recently invested in the "Good & Gather" line of products. According to Target's website, Target is "phasing out" its prior produce branding, including "Archer Farms," "Simply Balanced" and "Market Pantry."[6] This demonstrated disposability in Target's branding is evidence that Target is using the Good & Gather labeling to capitalize on a trend and profit from Plaintiff's already established goodwill. Furthermore, upon information and belief, Target invested tens—if not hundreds—of millions of dollars to establish, promote and market its "Archer Farms," "Simply Balanced" and "Market Pantry" brands only to cast them aside for a new line infringing on G&G's business.[7]

Contrarily, for G&G, "Garnish and Gather" is its livelihood and life's work. Golub Decl. ¶ 11. Losing control of the brand it has worked so hard to create and allowing for confusion between its brand and that of a large multi-national corporation would destroy G&G's goodwill. Yet, for Target, losing an auxiliary brand like the "Good & Gather" line would just be business as usual.

---

[6] *Meet Good & Gather, Target's Newest (and Most Delicious) Brand Yet*, TARGET, (Aug. 19, 2019), https://corporate.target.com/article/2019/08/good-gather (Pastore Decl. ¶ 2, Exh. 1).
[7] Monica Watrous, *Target food brand off to fast start*, SUPERMARKET PERIMITER, (Nov. 21, 2019), https://www.supermarketperimeter.com/articles/4406-targets-food-and-beverage-brand-off-to-strong-start (Pastore Decl. ¶ 8, Exh. 7).

**D.  At a Minimum, G&G has Shown Sufficiently Serious Questions Going to the Merits, and the Balance of Hardships Tips Decidedly in G&G's Favor**

Even if G&G could not establish a likelihood of success on the merits, which it has, it would nevertheless be appropriate for the Court to grant its application for preliminary relief because there are sufficiently serious questions going to the merits to make them a fair ground for litigation, and the balance of hardships tips decidedly in G&G's favor. *See Tradescape.com v. Shivaram,* 77 F. Supp. 2d 408, 411 (S.D.N.Y.) ("[T]he balance of hardships inquiry asks which of the two parties would suffer most grievously if the preliminary injunction motion were wrongly decided."). This is true for many of the same reasons that point to a finding of irreparable harm: G&G's allocation of substantial time and investment into building the value of the G&G Marks, the risk that Target's products will be of poor quality and neither locally sourced nor organically grown, tarnishing G&G's reputation and the G&G Marks, and the risk of losing control of the public's perception of its business. All these factors show that G&G is at risk of substantial hardship absent an injunction. *See Am. Electromedics Corp. v. Welch Allyn, Inc.,* No. 87-CV-1373, 1988 WL 12776, at *3 (N.D.N.Y. Feb. 16, 1988) ("If the defendant's product is of inferior quality, confusion between the products will have an adverse effect on the goodwill plaintiff has created over the years."); *Heartland Trademarks,* 2017 WL 3278905, at *6 ("Loss of control of the [] brand's reputation could undermine the goodwill that plaintiff has been building for twenty-five years. It could also jeopardize Plaintiffs...annual sales.").

By contrast, Target, which has only begun using its infringing marks, and chose to build its brand and strategy in a way that was highly likely to result in legal action against them, would suffer little or no hardship in the event the preliminary injunction was later lifted.

*See Bulman.,* 882 F. Supp. 2d at 565  ("Because Plaintiffs were first to develop the product and select the 'Pinweel' name, and because Defendant only selected the 'Pinwheel' name within the last several months…the Court finds that the balance of hardships weighs decidedly in favor of Plaintiffs."); *Mint, Inc. v. Amad,* No. 10 CIV. 9395 SAS, 2011 WL 1792570, at *3 (S.D.N.Y. May 9, 2011) ("[O]ne who elects to build a business on a product found to infringe cannot be heard to complain if an injunction against continuing infringement destroys the business so elected.").  Furthermore, Target's trademark infringement was willful in this case; Target had constructive notice of the existence of G&G's trademark, and, when threatened with legal action, Target made the decision to proceed.

For the foregoing reasons, the balance of hardships weighs significantly in G&G's favor.

### E.  <u>The Public Interest Weighs in Favor of an  Injunction</u>

Finally, the court must ensure that the public interest would not be disserved by the issuance of a preliminary injunction.  G&G has established a high likelihood of confusion in this case, and the Second Circuit has long held that there is a "strong interest in preventing public confusion." *ProFitness Phys. Therapy Ctr. v. Pro- Fit Ortho. and Sports Phys. Therapy P.C.,* 314 F.3d 62, 68 (2d Cir. 2002). Here, the risks and consequences of confusion for members of the public who may choose to purchase products from Defendants in the erroneous belief that they are endorsed by or associated with G&G—and its reputation for locally sourced, organically grown produce—are great.

In these circumstances,  the public interest tips strongly in favor of granting a preliminary injunction. The consuming public has a protectable interest in being free from

confusion, deception and mistake. *United States Polo Ass'n*, 800 F. Supp. 2d at 541  (citing *New York City Triathlon*, 704 F. Supp. 2d at 344) ("[T]he public has an interest in not being deceived—in being assured that the mark it associates with a product is not attached to goods of unknown origin and quality.")) (citing *SK & F. Co. v. Premo Pharm. Labs., Inc.*, 625 F.2d 1055, 1067 (3d Cir. 1980)); *Gayle Martz v. Sherpa Pet Group, LLC*, 651 F. Supp. 2d 72, 85 (S.D.N.Y. 2009).

## <u>CONCLUSION</u>

Because G&G has shown a substantial likelihood of success on the merits, and because G&G will suffer irreparable harm in the absence of immediate injunctive relief, G&G respectfully requests that this Court enter an Order for Preliminary Injunction that:

A.   Enjoins Defendants from using the "Good & Gather" labeling, alone or in combination with any word(s), term(s), designation(s), marks(s), or design(s), as well as any mark, image, or depiction that is confusingly similar to or likely to impair the distinctiveness of the G&G Marks anywhere in the United States, including in connection with the provision of products or services to internet users located in the United States, and enjoins Defendants' employees, owners, agents, officers, directors, attorneys, representatives, affiliates, subsidiaries, successors, and assigns, and all those in active concert or participation with them or having knowledge of the causes of action from enabling or assisting Defendants in such uses;  and

B.   Enjoins Defendants from making false or misleading statements concerning the G&G Marks in the sale, advertising, or promotion of Defendants' goods and services to any parties located in the United States, alone or in combination with any word(s), term(s), designation(s), marks(s), or design(s), as well as any mark, image, or

depiction that is confusingly similar or likely to impair the G&G Marks, and enjoins Defendants' employees, owners, agents, officers, directors, attorneys, representatives, affiliates, subsidiaries, successors, and assigns, and all those in active concert or participation with them or having knowledge of the causes of action from making or assisting Defendants in making such statements.

DATED:     New York, New York
           December 3, 2019

**Attorneys for Plaintiff**

By:    /s/
    Joseph M. Pastore III
    Pastore & Dailey LLC
    420 Lexington Avenue, 3rd Floor
    New York, NY 10170
    845.667.5711 (p)
    646.661.4322 (f)

By:    /s/
    Michael Lee
    Lee Law PLLC
    579 Fifth Avenue, 14th Floor
    New York, NY 10606
    212-621-8239